UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


UNITED STATES OF AMERICA,

       Plaintiff,

                                  CASE NO. 1:10-CR-39

v.

                                  HON. ROBERT J. JONKER

RONALD LYNN BURGEN,

       Defendant.
_____/

## OPINION AND ORDER

        This matter is before the Court on Defendant's Motion to Suppress Evidence (docket # 25). The Court held an evidentiary hearing on this motion on July 21, 2010. For the reasons discussed at the hearing, the Court denied Mr. Burgen's motion to suppress under the Fourth Amendment physical evidence discovered during the police searches of his residence and vehicles. The Court took the remainder of the motion under advisement and permitted counsel for each party to file supplemental briefing on the remaining issues regarding Mr. Burgen's motion to suppress under the Fifth Amendment statements he made to the police. The government filed supplemental memoranda (docket # 36). Mr. Burgen and his newly appointed counsel received an extension to September 17, 2010, to file any supplemental response. There has been no such filing, but the deadline has passed and the Court is prepared to determine the issue. For the reasons given below, Mr. Burgen's motion to suppress under the Fifth Amendment statements he made to the police is denied.

**FACTS**

In July 2009, the Kalamazoo Valley Enforcement Team (KVET) received an anonymous tip that Mr. Burgen was a convicted felon with one to two shotguns in his residence, and that he was involved in distributing methamphetamine. The tipster provided a significant amount of specific information that was later confirmed by the officers' investigation and observations. As a result of the anonymous tip, KVET Investigator Matthew Elzinga initiated an investigation of defendant. Investigator Elzinga and Kalamazoo County Deputy Sheriff Mike Hiemstra drove to Mr. Burgen's address, an apartment on the back of a house, shortly before they expected him to return home from work, intending to watch the residence and to conduct a "knock and talk" if Mr. Burgen came home. Both officers were wearing civilian clothes and neither officer had a visible weapon.

Around 5:30 p.m., Mr. Burgen returned home and parked in the driveway. While Mr. Burgen was still in his vehicle, Investigator Elzinga approached on foot and identified himself as a police officer. Investigator Elzinga knelt down next to the car and spoke to the still-seated Mr. Burgen through the open driver's side door, asking Mr. Burgen if he could speak with him regarding an investigation. Mr. Burgen agreed. By way of an investigatory ruse, Investigator Elzinga told Mr. Burgen that the police had received information that Mr. Burgen was in possession of a .44 caliber handgun. Mr. Burgen denied possessing that weapon or any type of handgun. To further the ruse, Investigator Elzinga said he thought someone may have been calling in a false allegation to get back at Mr. Burgen for some reason. Investigator Elzinga asked if they could continue their conversation in private in Mr. Burgen's apartment. Mr. Burgen agreed to continue the discussion, but he refused to let the officers into the apartment. Instead, Mr. Burgen and Investigator Elzinga

2

continued the conversation outside on the steps in the back of the apartment. In all, the conversation in the driveway lasted no more than five minutes.

During the conversation on the back steps, Investigator Elzinga discussed whether there was anyone who might be sufficiently angry with him to call in a false allegation and Mr. Burgen's work. Investigator Elzinga also suggested to Mr. Burgen that the report of a handgun may have originated from the fact that neighbors could smell marijuana coming from his apartment, and Mr. Burgen acknowledged that he did smoke small amounts of marijuana. Investigator Elzinga then told Mr. Burgen that he wanted to be able to close out his investigation and confirm that there was no handgun by searching Mr. Burgen's belongings. He told Mr. Burgen that, even if he found contraband in the apartment, he would not arrest Mr. Burgen that day. Investigator Elzinga then joked that the only exception to that commitment would be finding a dead body in the house. Mr. Burgen considered the request and consented to let the officers search his apartment. In all, the conversation on the back steps lasted no more than fifteen minutes.

Inside the apartment, Investigator Elzinga again expressed his appreciation to Mr. Burgen for his cooperation, and specifically asked if he could begin searching Mr. Burgen's belongings, to which Mr. Burgen agreed. Investigator Elzinga walked to the back bedroom with Mr. Burgen, at which point Mr. Burgen indicated that he needed to use the bathroom. Investigator Elzinga asked Mr. Burgen for consent to search his person before he used the bathroom, to which Mr. Burgen agreed. He also agreed to let Deputy Hiemstra search the bathroom before he entered it. In the search of Mr. Burgen's person, Investigator Elzinga found $918.00 in cash in Mr. Burgen's wallet. He set aside the cash, but he did not retain the entire wallet or Mr. Burgen's identification.

Mr. Burgen did not actually use the bathroom at that time, but instead he remained in the bedroom while the officers searched it. Mr. Burgen chose to sit in a chair near the bed and a stereo entertainment center. The officers did not place him in that seat, and he was not physically restrained during the search or directed by the officers in any way. After a few minutes, Investigator Elzinga observed Mr. Burgen place his left hand behind the stereo entertainment center. He asked Mr. Burgen to identify the object he was reaching for, and Mr. Burgen stated he was not reaching for anything. Investigator Elzinga then asked if it was a shotgun, and Mr. Burgen acknowledged that there was a shotgun behind the entertainment center. Investigator Elzinga retrieved the shotgun and set it aside. He did not arrest Mr. Burgen.

During the search of the apartment, Investigator Elzinga also found an eyeglass case concealed inside the lunch pail Mr. Burgen had just carried in from his car. Inside were three devices for smoking methamphetamine, "tooters." Additionally, Deputy Hiemstra found marijuana seeds contained in a small Ziploc baggie in Mr. Burgen's bedroom. The officers set aside these items as well.

Before the officers left the apartment, Investigator Elzinga asked permission to search Mr. Burgen's two vehicles, which were in the driveway. Mr. Burgen denied his consent to the search. Investigator Elzinga then requested assistance of a K-9 unit to conduct a free-air sniff of the two vehicles.

While the K-9 unit was en route, Investigator Elzinga again questioned Mr. Burgen. Investigator Elzinga first advised Mr. Burgen that he was not under arrest and that he was free to leave. During this discussion, Investigator Elzinga told Mr. Burgen that he had been conducting an investigation of Mr. Burgen regarding methamphetamine, and he asked Mr. Burgen how long he had

been smoking methamphetamine. Mr. Burgen then made several incriminating statements about his drug habits and gun possession. At the end of the interview, Investigator Elzinga reminded Mr. Burgen that he was free to leave at any time. Investigator Elzinga also advised Mr. Burgen that it might be in his interest to remain close by with his keys in case the vehicles needed to be opened, which would avoid the necessity of having a towing service come and unlock the vehicles.

After the discussion, the officers and Mr. Burgen left the apartment. The officers met outside with the K-9 unit, which had arrived by that time, and briefed K-9 Officer Peter Hoyt on the investigation. Officer Hoyt was in full uniform with a visible, holstered weapon. Mr. Burgen walked to his neighbor's house and spoke with some people in the neighbor's yard as the free-air sniff proceeded. He did not ask permission to leave, and the officers did not prevent him from leaving. Mr. Burgen's girlfriend, Carrie Warren, had arrived on site by this time. She parked her vehicle in the neighbor's driveway and joined Mr. Burgen on the neighbor's lawn.

Officer Hoyt then conducted a canine sniff of the vehicles. The sniff resulted in a positive narcotics alert on each vehicle. Mr. Burgen and Ms. Warren were outside on the neighbor's property during the search. Mr. Burgen told Investigator Elzinga that the keys to his vehicles were inside his apartment, and that Investigator Elzinga could retrieve the keys, if needed. Investigator Elzinga went and collected the keys, and Officer Hoyt then unlocked and searched the vehicles. The officers uncovered additional contraband, including approximately forty grams of marijuana and 5.36 grams of methamphetamine. After the search, Officer Hoyt and the K-9 unit left the scene.

Investigator Elzinga then spoke again with Mr. Burgen. He did not arrest Mr. Burgen, and he questioned him outside near his apartment. During this conversation, Mr. Burgen made additional incriminating statements about his methamphetamine purchases. He also stated for the first time that

he dealt in methamphetamine and described his sales volume and routine. After concluding the interview, the officers left without arresting Mr. Burgen.

On February 24, 2010, a federal grand jury returned a three-count indictment against Mr. Burgen. Count 1 charged him with being a felon in possession of a firearm; Count 2 charged him with possession with intent to distribute methamphetamine; and Count 3 charged him with possession of a firearm in furtherance of the drug trafficking crime charged in Count 2. Mr. Burgen moved to suppress the evidence found by the police and statements he made to the police. The Court denied his motion with regard to the physical evidence, but took under advisement his motion with regard to the statements he made to the police. The Court was concerned about the possibility that the officers took from Mr. Burgen not only his cash, but also his identification, and further that they prevented him from using either of his vehicles to leave the site, either by holding his driver's license or by precluding his access to his vehicles. Finally, the Court was concerned about the escalation of police presence as the encounter proceeded. Upon review of the record and the opportunity for study and reflection, the Court is satisfied that the totality of the circumstances here does not in any way support a custodial interrogation. Accordingly, the Court denies Mr. Burgen's motion to suppress the incriminating statements he made to the police.

## DISCUSSION

A suspect must be advised of his constitutional rights under the Fifth Amendment before being subjected to a custodial interrogation. *United States v. Salvo*, 133 F.3d 943, 948 (6th Cir. 1998); *see Miranda v. Arizona*, 384 U.S. 436, 479 (1966). If the police violate this rule, the resulting statements generally must be suppressed. *See Salvo*, 133 F.3d at 948. The court must distinguish, however, between "custodial interrogation" and "the mere questioning of a suspect in a coercive

environment." *Id.* (internal quotation marks omitted). "Any interview of one suspected of a crime by a police officer will have coercive aspects to it, simply by virtue of the fact that the police officer is part of a law enforcement system which may ultimately cause the suspect to be charged with a crime." *Id.* (quotation omitted). The mere fact that a suspect is in a coercive environment does not require a police officer to administer *Miranda* warnings to the suspect. *Id.* The test for determining whether a person is in custody and is therefore entitled to *Miranda* warnings at the time he makes a statement is whether, under the totality of the circumstances and viewed from the perspective of a reasonable person in the suspect's situation, the suspect's freedom of action was curtailed at a level associated with formal arrest. *Id.*

The Sixth Circuit has identified a number of factors a court should consider when determining whether a reasonable person would have understood from the totality of the circumstances that the interview was conducted in a custodial setting. *See id.* at 948, 950. These include

> (1) the purpose of the questioning; (2) whether the place of questioning was hostile or coercive; (3) the length of questioning; (4) other indicia of custody such as whether the suspect was informed at the time that the questioning was voluntary or that the suspect was free to leave or to request the officers to do so; [(5)] whether the suspect possessed unrestrained freedom of movement during questioning; and [(6)] whether the suspect initiated contact with the police or voluntarily admitted the officers to the residence and acquiesced to their requests to answer some questions.

*Id.* at 950.

Here, the totality of the circumstances supports the conclusion that Mr. Burgen was not in custody while he was speaking with the police. The questioning took place in or around Mr. Burgen's home, one of the least coercive environments possible. *See id.* at 951 ("[W]hen police

7

question a suspect in a residence, these circumstances often do not rise to the kind of custodial situation that necessitates Miranda warnings, whether they are free to leave or not."). Additionally, Mr. Burgen's interactions with the officers changed locations several times based on the input of Mr. Burgen himself, which suggests that the location and circumstances of the conversations were not hostile. *See id.* ("[The suspect] himself selected the locations for the interviews, which indicates he felt comfortable with them."). The questioning occurred over several reasonably short periods of time, each conversation lasting no more than approximately twenty minutes, and the entire encounter lasted only a few hours. *See id.* Investigator Elzinga several times stated explicitly that Mr. Burgen was not under arrest, and there are other indicia that suggest that Mr. Burgen was free to leave or to request that the officers leave. Mr. Burgen in fact initially declined to be interviewed in his home and the officers complied with his request. *See id.* Just as in *Salvo*, the undisputed testimony at the suppression hearing was that the officers told Mr. Burgen "that he was not under arrest, that he was free to leave at any time, and that he would not be arrested at the conclusion of the interview." *Id.* "[S]uch a statement by a police officer is an important factor in finding that the suspect was not in custody." *Id.*

Moreover, none of the officers' conduct suggested anything contrary to their verbal statements. *See id.* Mr. Burgen moved around during the course of the encounter, initially refused to allow the police officers to question him in his house, refused permission to the officers to search his car, and left his property and spoke with his neighbors even after the officers had found several items of contraband. *See id.* ("[T]he non-custodial nature of the October 1995 interview is made abundantly clear by the fact that [the suspect], at his own initiative and without being accompanied by the agents, left the computer room and went back to his room to retrieve the computer disk.").

Each of these actions indicates that the questioning was voluntary and that Mr. Burgen had unrestrained freedom of movement during the questioning and the overall encounter. *See id.* (describing "complete freedom of movement" as a suspect not being handcuffed or otherwise physically restrained, not being told he was under arrest, not being threatened with arrest, and not being told to "stay put"). Additionally, Mr. Burgen voluntarily admitted the officers into his home, and he agreed to answer their questions. *See id.* Although the officers eventually made it clear to Mr. Burgen that he "was the target of a criminal investigation, [his] freedom of action, during and after the interview, mitigated against the possibility he would feel 'in custody.'" *Id.* at 952.

With regard to the particular concerns of the Court, described above, the Court concludes that Officer Elzinga seized Mr. Burgen's cash when he searched the wallet in the house, but he did not retain the wallet at that time. Accordingly, Mr. Burgen had his identification, driver's license, and any other contents of his wallet during his later conversations with the officers. Additionally, although Officer Hoyt's arrival at the scene did escalate the police presence, the K-9 unit's presence was confined in time and place. Officer Hoyt had no direct interaction with Mr. Burgen, who was unrestrained and free to move about throughout the time that Officer Hoyt was on the scene. Indeed, Mr. Burgen actually left the scene without objections by the officer so he could talk with his girlfriend and a neighbor on the neighbor's property. Additionally, Officer Hoyt and the K-9 unit left the scene shortly after completing the free-air sniff and the ensuing search of Mr. Burgen's vehicles. Finally, during the time that the additional police officers were present, Mr. Burgen's girlfriend was also present and had her car available. Under these circumstances, the fact that Mr. Burgen did not have his cash or immediate access to his vehicles did not make his conversations with the officers coercive or custodial.

In conclusion, given the totality of the circumstances in this case, Mr. Burgen was not "in custody" for the purposes of the Fifth Amendment's protections during any of his conversations with the officers. *See id.* Accordingly, Mr. Burgen was not entitled to *Miranda* warnings, and the absence of the warnings does not mandate suppression of his statements. *See id.*

## Conclusion

Mr. Burgen's motion to suppress the statements he made to the police (docket # 25) is **DENIED**.


Dated: September 28, 2010        /s/ Robert J. Jonker
                                 ROBERT J. JONKER
                                 UNITED STATES DISTRICT JUDGE